2021 IL App (1st) 190433-U

No. 1-19-0433

Order filed February 19, 2021

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 7695 |
| | ) | |
| JUMUEL PATTERSON, | ) | Honorable |
| | ) | Earl B. Hoffenberg, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE DELORT delivered the judgment of the court.
Justices Hoffman and Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm defendant's conviction and sentence over his contention his sentence
was excessive.

¶ 2    Following a bench trial, the circuit court found defendant Jumuel Patterson guilty of

aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2016)) and aggravated

discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2016)) and sentenced him to consecutive

prison terms of 10 and 4 years, respectively. He appeals, arguing his sentence was excessive. We affirm.

¶ 3    The State charged defendant by indictment with eight counts of attempt first degree murder, one count of aggravated battery with a firearm, and one count of aggravated discharge of a firearm. The charges arose out of an incident during which defendant fired a gun at Rami Yahya, left the scene, returned with a second gun, and shot Adham Denah in the leg.

¶ 4    At trial, Rami testified that, around 10:24 p.m. on January 30, 2017, he was working behind the counter at D&D Food and Liquors (D&D).[1] At that time, defendant and a woman came into the store and selected a bottle of liquor from behind the counter. Rami rang up the purchase and told them the price. Defendant began to argue with Rami about the price as the woman tried to calm defendant. Rami told defendant he could either purchase the liquor at the stated price or leave, and defendant responded by pulling a gun from his right side.

¶ 5    Rami, who had a firearm owner's identification card and concealed carry license, drew his gun, which was a full-sized semiautomatic 9-millimeter Beretta PX Storm, loaded it, and backed away from defendant. The woman pushed defendant out the door and, as she did so, defendant raised his gun and fired a single shot at but did not hit Rami. The magazine fell out of defendant's gun as he shot at Rami. Another employee of D&D, Peter McKnight, who had been outside smoking a cigarette, came inside to check on Rami, as did Rami's brother, Majdee, who owned the Pita Café located in the same strip mall. Rami pressed two panic buttons behind the counter and followed McKnight outside.

_____

[1] Because Rami Yahya's brother, Majdee Yahya, also testified, we refer to both men by their first names.

¶ 6      Once outside, Rami observed defendant standing alone on the sidewalk. The woman attempted to leave in her car, but Majdee drove his truck behind it to block her in until the police came. Rami then observed defendant run across the street and into an alley.

¶ 7      Rami, Majdee, McKnight, and Adham Denah, who also worked at the Pita Café, waited for police outside the store, trying to keep the woman from leaving. As they waited, Rami had his weapon drawn but did not point it at the woman. Defendant returned and fired six shots toward the men. McKnight told the men to run, but Denah was struck by a bullet in his leg.

¶ 8      Denah testified that, on January 30, 2017, he was working as a cook at the Pita Café. Around 10:25 p.m., he walked outside to smoke a cigarette and then joined Majdee and McKnight, who were sitting inside Majdee's truck outside the Pita Café. Denah observed a woman pulling a man out of D&D as the man shot a gun inside the store.

¶ 9      Majdee blocked the vehicle the man had arrived in with his truck and told Denah to call the police. The man ran off and returned about five minutes later. Denah heard gunfire and ran, but he was struck in his leg. McKnight came to Denah's aid and tied his hooded sweatshirt and Denah's belt around his leg. An ambulance transported Denah to the hospital, where doctors told him the bullet had shattered inside his leg and could not be removed because it was near a nerve. Though he was able to walk normally before he was shot, he now walked with a cane and would be required to do so for the rest of his life. Additionally, Denah testified he worked between 18 and 20 hours per day before he was shot but was unable to do so after.

¶ 10      Majdee testified that, on January 30, 2017, he was working at the Pita Café. Around 10:24 p.m., he was in his truck waiting to drive home Denah and McKnight. He saw defendant point a gun into the store and fire a single shot.

¶ 11    Majdee drove his truck over to D&D and blocked the vehicle in which defendant had arrived, and then he, McKnight, and Denah went inside D&D to check on Rami. Majdee went back outside and began "cursing at [defendant] to come back." Defendant, who was "at the end of the parking lot," pointed his gun at them and tried to shoot but was unable to do so because the magazine had fallen out of the gun. Defendant disappeared for three or four minutes and then returned to the same spot, raised a gun, and shot toward the men.

¶ 12    The State also presented the testimony of several police officers, including evidence technician Worthem and Detective Eric Reyes.[2] Worthem testified he surveyed the area around D&D and found only a single shell casing. He explained that semiautomatic firearms typically expel shell casings but revolvers do not. Reyes testified that, during the course of his investigation, he learned the woman who was with defendant was Jasmine Coakley, who lived approximately a half block away from D&D.

¶ 13    The court found defendant guilty of aggravated battery with a firearm and aggravated discharge of a firearm but not guilty of the eight counts of attempt first degree murder. In doing so, it found that defendant went to Coakley's house to retrieve a second gun before he returned to shoot again at the men. Defendant filed a posttrial motion, which the court denied.

¶ 14    Before sentencing, the court ordered a presentence investigation report (PSI) to be prepared for defendant. The PSI indicated defendant was 25 years old at the time of the offense, was the youngest of four children, lived with his mother, had an 11th grade education, worked part time as a landscaper earning $600 per month, and had two children. The PSI also indicated defendant had a 2015 conviction for possession of a controlled substance for which he received a

_____

[2] The trial transcript does not identify Worthem's first name.

sentence of two years' probation. At sentencing, the State offered two corrections to the PSI, stating defendant's 2015 conviction was for delivery, not possession, of a controlled substance and that he had a 2009 conviction for burglary.[3]

¶ 15    At sentencing, the State presented the testimony of Denah to establish defendant's eligibility for mandatory consecutive sentencing based on defendant having caused Denah severe bodily injury (see 730 ILCS 5/5-8-4(d)(1) (West 2016)). Denah testified that he was 26 years old when he was shot and never had any problems walking until then. Now, however, he walks with a limp and a cane. Further, his limp had caused a slipped disc in his lower back, and he suffers from a constant stabbing pain due to the bullet fragments that remain near a nerve in his leg. In addition, he received physical therapy treatments and injections, and takes medication for depression, anxiety, and posttraumatic stress disorder.

¶ 16    The State also presented victim impact statements from Denah and Rami. In Denah's statement, he stated he came to the United States "looking for a better life for [him]self and to be able to help his family," but after the incident, everything changed. He stated he felt worthless because he could not fulfill his purpose of helping his family or himself. He also stated that he could not perform physically like a normal man and faced difficulty and limitations in his everyday life. Further, he stated he was left with no means of earning income and had been rejected from receiving disability benefits because of his immigration status. He stated he suffered from depression and anxiety, causing him to "look over [his] shoulder every time [he] walk[ed] out of the house." Finally, he stated he was working "to accept [his] fate that God placed on [him]," and "there [was] no solution but to deal with it."

---

[3] The record does not indicate what sentence defendant received for the 2009 burglary conviction.

¶ 17    In Rami's statement, he stated he was a new father when the incident occurred and that the incident had affected his natural instinct to think of the good in people. Now, however, he was hostile and afraid when "faced with new people." He further stated he was unable to sleep at night for months after the incident and "any time [his] wife or daughter woke [him] up ***, it was like [he] was woke up to gunshots, not their voices," causing him to wake up "yelling and afraid." He also stated he could not help but think that defendant would one day want revenge for his incarceration, which was "a weight [he would] forever carry on [his] shoulders."

¶ 18    In mitigation, defendant presented letters from Rashad Hill, Mahogany Williams, and Daniel Bentley, all of whom were his cousins. The letters stated that defendant was a "very loving person with a big heart," a "family man" who was involved with his family and community, "level-headed," polite, and respectable.

¶ 19    In allocution, defendant stated he was "sorry for what happened to [Denah]." He also stated that he was a good father to his seven- and four-year-old sons and that he was not a "bad guy." Rather, on the night of the offense, he was "scared for his life," and that if Rami had "never [been] up on [him], nothing would have happened."

¶ 20    The State's argument focused on the seriousness of the offense and the severity of the injury defendant caused to Denah. The State argued imposing the minimum sentence "would be an insult" to Rami and Denah and recommended a sentence of "well over 20 years."

¶ 21    Defense counsel argued defendant had strong family ties, took care of his family and children, had a minimal, nonviolent criminal background and had not been to prison, and was not affiliated with any gangs. Counsel further argued the offense "was an aberration in his behavior" and that, on the night of the offense, defendant came back to the store because his girlfriend was

being held or detained by Rami, who was holding a gun. Counsel recommended, based on defendant's background and the fact that the sentences would run consecutively and be served at 85 percent, "a reasonable sentence" near the minimum.

¶ 22    In announcing defendant's sentence, the court found defendant had inflicted severe bodily injury to Denah, which required it to impose consecutive sentences. In fact, the court found "this [was] really one of the more severe bodily injuries [it] ha[d] seen." The court did not believe defendant's statement that he was scared for his life because he went to Coakley's house to get another gun, came back, and "started shooting all over the place," a fact the court found "bother[some]." The court stated it had considered the evidence in aggravation and mitigation and sentenced defendant to consecutive terms of 10 years' imprisonment on the aggravated battery with a firearm conviction and 4 years' imprisonment on the aggravated discharge of a firearm conviction, for an aggregate sentence of 14 years.

¶ 23    The same day, defendant filed a motion to reconsider sentence. In denying the motion, the court stated it had listened carefully to the letters presented by defendant and his statement in allocution and that it did not give any undue weight to any factors in aggravation. Additionally, the court stated it had considered defendant's background and the fact he had two children. This appeal followed.

¶ 24    On appeal, defendant argues the trial court abused its discretion by sentencing him to an aggregate term of 14 years' imprisonment. Defendant does not dispute he was eligible for mandatory consecutive sentences based on his causing severe bodily injury to Denah, but rather argues his sentence was excessive in light of the mitigating evidence in the record.

¶ 25 The Illinois Constitution states "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. To achieve the constitutionally mandated balance between the retributive and rehabilitative purposes of punishment, the trial court must carefully consider all aggravating and mitigating factors, including "the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of defendant's conduct in the commission of it." *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002).

¶ 26 The trial court, not the reviewing court, is in the best position to assess these factors because it has observed the defendant and the proceedings. *People v. Alexander*, 239 Ill. 2d 205, 213 (2010). Accordingly, the trial court has broad discretionary powers in imposing a sentence, which are entitled to great deference. *Id.* at 212. We do not reweigh the evidence in aggravation and mitigation or substitute our judgment for that of the trial court merely because we would have weighed these factors differently. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). Instead, we will overturn a sentence only where the trial court has abused its discretion. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19. An abuse of discretion occurs when the court's sentence "is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *People v. Charleston*, 2018 IL App (1st) 161323, ¶ 16.

¶ 27 The court sentenced defendant to the minimum term of four years' imprisonment on the aggravated discharge of a firearm conviction. See 720 ILCS 5/24-1.2(a)(2), (b) (West 2016) (aggravated discharge of a firearm as charged here is a Class 1 felony); 730 ILCS 5/5-4.5-30(a) (West 2016) (Class 1 felonies carry a sentencing range of 4 to 15 years imprisonment). Though

defendant analyzes his aggregate 14-year sentence as a single sentence, we must treat each of his consecutive sentences separately and analyze them as such. See *People v. Carney*, 196 Ill. 2d 518, 530 (2001) ("[C]onsecutive sentences do not constitute a single sentence and cannot be combined as though they were one sentence for one offense."). Accordingly, because defendant was sentenced to the minimum term on the aggravated discharge of a firearm conviction, we will review only whether his 10-year sentence for the aggravated battery with a firearm conviction was excessive.

¶ 28     After reviewing the record, we conclude the court did not abuse its discretion when it sentenced defendant to 10 years' imprisonment on the aggravated battery with a firearm conviction. The offense of aggravated battery with a firearm is a Class X felony, which has a statutorily mandated sentencing range of 6 to 30 years' imprisonment. 720 ILCS 5/12-3.05(e)(1), (h) (West 2016); 730 ILCS 5/5-4.5-25(a) (West 2016). Because defendant's 10-year sentence fell within the applicable sentencing range, we presume the sentence is proper. *Charleston*, 2018 IL App (1st) 161323, ¶ 16. This presumption will be rebutted only if defendant makes an affirmative showing the sentence greatly departs from the spirit and purpose of the law or the constitutional guidelines. *People v. Boclair*, 225 Ill. App. 3d 331, 335 (1992). Defendant has failed to make such a showing.

¶ 29     Defendant argues the trial court "was given a significant amount of mitigation to consider before passing sentence" but failed to adequately do so. Specifically, he argues the court failed to adequately consider his employment, the fact he took care of his two small children, his family support, the fact he was a "family man" and helpful to those in his community, his lack of gang affiliation, and the fact he had only two prior convictions for which he received sentences of

probation, all of which evidenced his rehabilitative potential. He notes that, while the trial court specifically referred to the seriousness of the offense and the fact defendant returned to D&D and fired a different weapon, the court "made not [*sic*] mention of the mitigation."

¶ 30    Defendant essentially invites this court to reweigh the evidence in aggravation and mitigation and substitute our judgment for that of the trial court. We decline to do so. *Stacey*, 193 Ill. 2d at 209. Further, trial courts are not required to impose the minimum sentence in the absence of any aggravating factors, even where mitigating factors are present. *Quintana*, 332 Ill. App. 3d at 109.

¶ 31    Moreover, the record belies defendant's argument the trial court failed to consider the evidence in mitigation to which he points on appeal. There exists a presumption the court considered all mitigating factors supported by the record absent some affirmative indication, other than the sentence itself, to the contrary. *People v. Jones*, 2014 IL App (1st) 120927, ¶ 55. The court "need not detail precisely for the record the exact thought process undertaken to arrive at the ultimate sentencing decision or articulate its consideration of mitigating factors." *People v. Abrams*, 2015 IL App (1st) 133746, ¶ 32. The record shows all the mitigating evidence on which defendant relies here was before the court in the PSI and was extensively argued by defense counsel at sentencing. When announcing the sentence, the trial court noted it had considered all the factors in aggravation and mitigation.

¶ 32    Additionally, we note that, in denying defendant's motion to reconsider sentence, the court specifically stated it had considered defendant's background, the fact he had two children, the letters submitted in support of defendant, which emphasized his family and community ties,

and his statement in allocution. Accordingly, the record reflects the court considered all the mitigating evidence presented by defendant.

¶ 33    Defendant also argues the court focused on the seriousness of the offense but failed to consider that he came back to the scene because his girlfriend, Coakley, was being held there by Majdee, who had blocked in her car, and Rami, who "was pointing a full-sized semi-automatic weapon."

¶ 34    The seriousness of the offense is the most important sentencing factor. *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 123. A court is not required to give greater weight to the mitigating factors than to the seriousness of the offense. *Id.* We agree with the court's finding that defendant's conduct was serious and warranted a sentence in excess of the minimum. Indeed, the evidence at trial established that defendant entered D&D, started an argument with Rami over the price of liquor, and then drew a weapon and fired it into the store as Coakley pulled him outside. When defendant's firearm failed him, he left the scene, retrieved a second gun, and returned to the scene, firing the gun recklessly into a crowd of people. Further, defendant's actions seriously injured Denah and forever changed the lives of both Denah and Rami. In light of this evidence, we find defendant's sentence for aggravated battery with a firearm, which was only four years in excess of the minimum, was appropriate.

¶ 35    We are not persuaded by defendant's assertion that the fact that Rami and Majdee had prevented Coakley from leaving the scene in any way excused his conduct of returning to the scene and firing recklessly at the crowd of people. First, we note the record belies defendant's assertion that Rami had his gun pointed at Coakley while he and Majdee held her at the scene. The record contains no evidence that Rami pointed his gun at Coakley. Rather, Rami testified he

had his gun drawn but never pointed it at Coakley. In any event, even if defendant was justified in coming back to the scene to ensure Coakley was not harmed, his conduct of retrieving a second gun and firing it into the crowd was not justified under those circumstances.

¶ 36    In sum, we find the court adequately weighed the evidence in aggravation and mitigation and fashioned a sentence that was appropriate under the circumstances, particularly in light of the seriousness of the offense. We therefore find defendant has failed to establish his sentence "is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense" and affirm the circuit court's judgment. *Charleston*, 2018 IL App (1st) 161323, ¶ 16.

¶ 37    Affirmed.